Filed 7/29/14  In re E.A. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re E.A., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>E.A.,<br><br>        Defendant and Appellant. | A138988<br><br>(Alameda County<br>Super. Ct. No. C-182345) |

**INTRODUCTION**

Defendant E.A., a minor, appeals the juvenile court's dispositional orders terminating his dependency status and declaring him a ward of the court.  Defendant contends that the juvenile court erred by declaring him a ward of the court and violated his constitutional and statutory rights to due process by holding a jurisdictional hearing pursuant to Welfare and Institutions Code[1] section 600 before ordering an assessment pursuant to section 241.1.  As explained below, we reject these contentions of error.  However, defendant also contends his maximum custody exposure should be reduced by six months, and the Attorney General concurs, as do we.  Accordingly, we direct the

---

[1] Unless otherwise indicated, all further unspecified statutory references are to the Welfare and Institutions Code.

juvenile court to amend the dispositional order to reflect a maximum time of confinement of three years, and otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Dependency Proceedings*

By the time defendant was adjudged a ward of the court at 14 years old in May 2013, defendant and his family had experienced a long history of contact and involvement with child welfare services. Defendant's mother (mother) is the single parent of six children and has developmental disabilities and limitations. All the children have varying degrees of learning disabilities, developmental disabilities and serious behavioral issues. Defendant and his siblings were raised in a very chaotic home environment, witnessing numerous episodes of domestic violence, as well as other acts of violence within the neighborhood. Mother has been involved with Alameda County Social Services Agency (Agency) since 2001, with 31 referrals and a case history for issues related to physical abuse and general neglect of all six of her children.

Defendant has been the subject of three dependency proceedings, the first of which was instigated in May 2001 when he was two years old. In August 2009, when defendant was 10 years old, the Agency filed the third section 300 dependency petition relating to defendant's family, alleging as to defendant and his older brother C.H. (age 12) that mother was "unable and unwilling to provide the necessary care, support and supervision, . . . due to [their] extensive behavioral and mental health issues/needs" and had signed a voluntarily relinquishment of custody for both minors. The Agency's detention report dated August 18, 2009, states "the minors have been exhibiting dangerous behaviors. They had been picked up by the Oakland Police Department twice during the previous week for being out past curfew and causing trouble in the family home and within the surrounding neighborhood. . . . The children reportedly have been stealing; hustling in the neighborhood, and now the mother is facing eviction due to the children's behaviors and harassment of other people living in the complex. [Mother]

2

stated that Child Protective Services 'needed to come out and pick up her kids immediately.' It appeared that [mother] was at the end of her rope and was not able to control the children."

In an interview with the social worker, mother stated the minors (defendant and C.H.) have always had behavioral problems, but they had worsened in the past six months. Recently, they do not listen to her at all and had been intimidating towards her and the other children. Mother stated the minors are destructive in the home and in the community; they have broken windows, destroyed property, stolen from family and neighbors and the police confiscated a pellet gun from them. The minors "hang out until well after dark . . . with older teens and adults in the area," and mother fears they are involved in gang and/or illegal activities. Mother is aware the minors "are scamming people for money," for example by collecting "donations" for a nonexistent basketball team, and then spending the money on clothes and electronics. Mother is concerned about "the dangerous people the boys associate with and she fears they could be harmed intentionally or unintentionally."

The social worker also talked to defendant and C.H. in the course of transporting them from home to the assessment center. The minors were so agitated the social worker thought they were under the influence of a stimulant. They presented as chaotic and impulsive, used profanity to complain about the situation and "brag about their street credibility. They showed absolutely no fear or respect for authority and it seems clear that they are used to doing whatever they want." The minors bragged to the social worker that they have numerous "uncles" and "brothers" who are not blood related, and claimed they had possessed firearms before. The social worker opined the minors "have a lot of knowledge of what goes on in the streets and it seems they are already involved in dangerous and probably illegal activities." For example, they "admitted to 'scamming' people for money by soliciting donations for a fake basketball team."

At the detention hearing held on August 18, 2009, the court designated defendant's appointed counsel as his guardian ad litem and ordered him detained for placement in a suitable family home or private institution. On August 20, 2009, the court authorized the administration of psychotropic medications to defendant on the treating physician's preliminary diagnosis of intermittent explosive disorder and bipolar disorder, manic type. The jurisdiction/disposition report related that defendant had been transferred from a psychiatric unit where he had been held pursuant to section 5150 at Lincoln Child Center in Oakland (the Center), where he was "doing relatively well" and appeared to be "moving in a positive direction in terms of . . . behavior." At an uncontested disposition hearing held on September 1, 2009, the court established dependency and ordered out-of-home placement.

The Agency's status review report of February 2010 related defendant was still at the Center. Mother had maintained regular telephone contact with defendant and visited him at the Center on a weekly basis. Defendant had "shown some improvement and is learning to work out his dilemmas." He has been diagnosed with mood disorder and disruptive behavior disorder. Defendant's assigned psychiatrist placed defendant on a drug regime of Risperdone, Cogentin and Seroquel in prescribed dosages. Defendant reports he wants to return home as soon as possible, but knows he needs to continue to work on his behavior. According to the Center staff, defendant is engaged with staff and peers, but "takes offense when he is challenged by authority." Following the status review hearing held on February 19, 2010, the court continued defendant in placement.

The Agency filed a 12-month status review report on July 26, 2010, recommending defendant continue in placement. The report notes defendant is enrolled in sixth grade at Lincoln Child Center School, but has a difficult time managing his behavior in class. According to his therapist at the Center, defendant manages his behavior at times and at other times he is completely out of control. At times, defendant appears unable to control his temper, making him aggressive, volatile and disrespectful.

4

He has received numerous incident reports on account of his behavior. Mother has maintained contact with defendant and his older brother, and they have had overnight visits and occasional day visits. Defendant would like to return home, but needs to engage in ongoing therapy and medication management in order to manage his behavior appropriately. Following the status review hearing on August 19, 2010, the court continued defendant as a dependent with the permanent plan of placement at the Center and the specific goal of returning home.

In January 2011, the Agency submitted an ex parte application for defendant to go home on a two-week extended visit with his mother on a trial placement. Defendant had expressed frustration over never returning home and his behavior was regressing. The Center staff, defendant's therapist and social worker agreed an extended home visit would give defendant hope of returning home and help stabilize his behavior. On February 4, 2011, the court continued the minor as a dependent, and placed him at home with his mother with family maintenance services.

On June 21, 2011, the Agency filed a supplemental petition pursuant to section 387, alleging mother is unable to manage defendant's "acting out" behaviors, due to his severe emotional instability and her own developmental delays. Specifically, the section 387 petition alleged mother was unwilling or unable to ensure defendant takes his medications; and defendant is becoming increasingly aggressive, which places his own safety and the safety of others at risk. The detention report states defendant was removed from his mother's home and taken to the assessment center on June 9, 2011. He was placed at Refuge Group Home (Refuge) on June 11 and shortly thereafter went absent without leave (AWOL). The Refuge case manager reports defendant comes and goes during the day, sometimes attends school, and usually sleeps at a friend's home or at his mother's home. The social worker expressed concern defendant was not taking his medications while AWOL.

5

The Agency requested a continuance of the jurisdiction/disposition hearing in order to assess defendant's stability and the option of placement with mother. In an addendum report dated August 16, 2011, the social worker stated defendant continually goes AWOL from his placement at Refuge; on July 29, 2011, defendant was taken for a psychiatric evaluation after threatening another minor at Refuge, was later discharged and continued on his medication, Seroquel, with a diagnosis of intermittent explosive disorder. In a second addendum report filed on October 14, 2011, the Agency changed its recommendation to a planned permanent living arrangement for the minor. The Agency reported defendant has been AWOL on overnights from his placement at Refuge, and had been staying at his mother's home or elsewhere in the community; he attended school at Seneca Center in San Leandro, where he attended group therapy and participates, albeit "in negative ways." The staff at Refuge recommended stabilizing defendant in his placement "to avoid a higher level of care."

In a third addendum report filed on November 23, 2011, the Agency reported defendant was admitted to the emergency room at Children's Hospital in Oakland with two gunshot wounds to the abdomen on November 6, 2011 and discharged on November 16, 2011 after recovering from emergency surgery. Regarding placement, the Agency's goal was to place defendant with a nonrelative extended family member (NREFM), a former foster parent who had asked for the placement. Defendant was not attending school on a regular basis, was at second or third grade level for language arts, and was often only in class for a short time before leaving for the crisis room. On November 28, 2011, the court sustained the allegations of the section 387 supplemental petition, continued defendant as a dependent, set aside the order placing him in mother's home, and ordered defendant to be placed with the NREFM and the Agency to investigate a possible level 14 placement.

In an interim review report filed on December 23, 2011, the social worker stated defendant has been in placement with the NREFM since November 23, is recovering well

6

from his gunshot wounds, and has not spoken about running away. The caregiver reports defendant is doing well in the home, and she is currently trying to enroll him in school in Tracy. However, in a subsequent status review report filed on April 30, 2012, the social worker reported the NREFM relinquished care of defendant due to his behaviors and refusal to attend school on a regular basis. Thereafter, defendant spent 72 hours at Willow Rock on a section 5150 hold, before he was placed at Hawk's Place Group Home (Hawk's Place), in Contra Costa County on February 6, 2012. Defendant stated he liked living at Hawk's Place, but was concerned he was too far away from Oakland, where his mother and siblings lives. Hawk's Place director reported defendant "is a pleasure to have around," had adjusted well to the group home, and benefited from the positive role modeling provided by the young men at the home who were attending school and going to college. On May 9, 2012, the court continued defendant as a dependent with the permanent plan of placement at Hawk's Place and a specific goal of independent living with the aid of a caring adult.

In the status review report filed on October 26, 2012, the social worker reported Hawk's Place closed abruptly due to a licensing infraction and defendant was placed at Creative Alternatives Group Home (CAGH) in Merced on October 13, 2012. However, defendant went AWOL while returning to CAGH after a visit with his family in Oakland; he exhibited signs of a panic attack in the car and after CAGH staff pulled over to the side of the freeway, defendant jumped out of the car and ran off. A protective custody warrant was filed on October 22, 2012. Also, defendant stopped taking Seroquel because he did not like the way it made him feel; he rejected a medication evaluation and asserted he does not need medication. The social worker stated defendant has not exhibited any behavior requiring medication and a medication evaluation is not necessary at this time. Defendant appeared for the status review hearing held on November 7, 2012, and the court recalled the protective custody warrant. The court ordered defendant placed in the

Westwind Foster Family Agency home of Brian and Pearlina Gaither with a specific goal of legal guardianship.

That plan soon fell apart. In a status review report filed on April 19, 2013, the social worker reported defendant was currently AWOL again. Defendant was placed with the Gaithers on November 1, 2012. On December 6, 2012, the social worker received a call from Mrs. Gaither requesting a meeting because defendant was being defiant, disrespectful to her and refused to do his chores. He also refused to comply with his curfew and stayed out overnight without permission. Defendant went AWOL from the Gaithers' home on December 14, 2012. On January 18, 2014, his mother reported he had returned to her home; and he was now staying with mother without Agency recommendation or approval. The social worker opined defendant had "been on a downward spiral" since Hawk's Place closed in October 2012. The social worker reported that defendant had become defiant to most adults in his life, refused to attend school, and was hanging out in the streets. Mother allowed him to stay in her home because she did not want him on the streets, however, she did not set firm limits on his behavior and conduct. The social worker expressed she is "at a loss on what to do with [defendant] so he will remain safe, attend school, and follow the rules of his placement."

On April 23, 2013, defendant's court-appointed special advocate (CASA) filed an addendum report stating a team decision meeting (TDM) had taken place regarding defendant's placement. Everyone at the TDM agreed the best placement for defendant is at Cedar's Place in Hercules, a facility operated by the director of the now defunct Hawk's Place group home, a prior placement where defendant had made progress.

## B.     *Wardship Proceedings*

On April 24, 2013, the District Attorney of Alameda County (DA) filed a delinquency petition pursuant to section 602, subdivision (a).[2] The petition alleged

_____

[2] This was not defendant's first section 602 petition. On March 10, 2010, just after the six-month review point in the section 300 proceeding described above, the DA's

8

defendant (age 14) committed residential burglary, in violation of Penal Code sections 459 and 460, subdivision (a) (count one), and possessed a projectile firearm, a replica BB gun resembling a .45-caliber semiautomatic handgun, a misdemeanor in violation of Oakland Municipal Code section 9.36.130, subdivision (A) (count two).

Regarding the burglary charge, the Oakland police report related that on April 23, 2013, at approximately 11:20 a.m., an after school coordinator received a phone call reporting someone was breaking into a residence on 7th Street. Security officers responded to the scene. A security officer saw defendant jumping over the back fence of

---

office filed a wardship petition pursuant to section 602 alleging two counts of felony assault (Pen. Code, § 245, subd. (a)(1)) and one count of felony battery (Pen. Code, § 243, subd. (d)), arising from defendant's assault on two of the Center staff members. The probation officer's intake/jurisdiction report states staff member Yen Luv tried to stop defendant from climbing onto the roof of a shed to join his 11-year-old and 12-year-old friends and defendant punched her in the chest and kicked her in the legs. After defendant joined his friends on the roof, another staff member, Valerie Labanca, came to assist Luv. One of the boys threw a three and one-half foot stick, which hit Labanca in her right eye and caused bleeding. Police officers subsequently arrived, ordered defendant and his friends off the roof and took them into custody. The report also notes that since being placed at the Center, defendant had incurred 53 documented incident reports for inappropriate behavior.

At a hearing held on May 12, 2010, the DA dismissed the felony charges with restitution open and defendant admitted one count of misdemeanor battery (Pen. Code § 242) pursuant to an amended petition. The court ordered probation to prepare a section 241.1 report. In their section 241.1 report, the Agency and the probation department recommended that the court continue defendant as a section 300 dependent because he "does not have a lengthy history with probation, he is in a stable environment [at the Center] where the program is willing to continue to work with him on his issues." At a hearing held on July 14, 2010, the court continued defendant's dependency and placed him on probation without wardship pursuant to section 725, subdivision (a).

In a December 2010 progress report, the probation officer noted defendant had not complied with conditions of probation requiring that he pay $25 in restitution and complete an apology letter to the victim. However, the probation officer recommended that if defendant appeared at the hearing with a copy of the apology letter, the restitution fine should be set aside and the entire matter dismissed. At a hearing held on December 8, 2010, defendant appeared by counsel and submitted a letter of apology. The court set aside the restitution fine and dismissed the matter.

the residence in question, and detained him. An Oakland police officer examined the victim's residence. The rear door had substantial pry marks around the door knobs and the inside of the door frame was severely damaged. The perpetrator(s) had conducted "a messy search" of upstairs bedrooms, and two screwdrivers found on one of the beds appeared to have been used to pry open the rear door.

In regard to the misdemeanor weapons charge, the BART police report related that at 9:23 p.m., on March 28, 2013, BART police officers were in the area around the MacArthur BART station on the report of two African-American juveniles, one of whom appeared to be carrying a concealed weapon. The officers contacted defendant and another minor at the scene. The officers found a BB gun (a replica of a Colt .45-caliber semiautomatic pistol) in defendant's front waistband after one of the officers approached defendant with his service weapon unholstered and pointed at the ground.

Defendant appeared in detention at a hearing held April 25, 2013, represented by the public defender; dependency counsel was also present. The court recalled the warrant and defense counsel requested that the matter be "put over to May 1st for a pretrial and May 14th for a jurisdictional hearing." The court granted counsel's request and ordered defendant detained under the care of the probation department. At the May 1 hearing, defense counsel advised the court defendant wished to admit to second degree burglary, with restitution open. The court stated defendant's maximum exposure was three years six months and, thereafter, advised defendant of his constitutional rights. Defense counsel stipulated the police report provided a factual basis for the guilty plea. The court found defendant knowingly and voluntarily waived his rights and pleaded guilty. The court accepted the plea and dismissed count two. The court set a disposition hearing for May 22 and ordered a section 241.1 report.

The Agency and the probation department filed a section 241.1 report on May 20, 2013. The report related defendant "has absconded from every Social Services placement . . . . He will not attend school. He smokes weed with his friends, hangs out

past his 8:45 p.m. curfew, and often stays out overnight without his mother's permission with people his mother does not know. [Defendant] is also very defiant towards most of the adults in his life. . . . [¶] . . . [Defendant] stated to his child welfare worker . . . his plan is to . . . go AWOL, not to go to school, and get in trouble so no one will deal with him and he can be sent home." The Agency and the probation department agreed defendant should be adjudged a ward of the court for his safety and the safety of the community.

At the disposition hearing held on May 22, 2013, defendant's public defender (trial counsel) and dependency counsel both appeared on his behalf. However, county counsel was not present and trial counsel had another matter at which she had to be present. Trial counsel agreed to put her comments on the record regarding the section 241.1 report's recommendation of wardship. Trial counsel stated she disagreed with the recommendation, stating defendant committed the burglary on his 14th birthday and should remain in dependency proceedings on account of his young age. Dependency counsel agreed with trial counsel, arguing that the placements that worked for defendant, such as the Center and Hawk's Place, had closed down. Dependency counsel also argued dependency was preferable because defendant is a "special-needs child" who had "bounced around" placements and requires a stable placement and therapeutic services. Counsel for the Agency noted that in addition to the current matter, defendant was recently arrested in San Francisco for possession of a stolen iPhone, and was facing charges for that offense.

The court stated it was concerned with defendant's escalating delinquent behavior, beginning with assault and moving to burglary and possession of a BB gun resembling a .45-caliber semiautomatic handgun. Thereafter, the court declared defendant a ward of the court and set the maximum term of confinement at three years six months. The court dismissed dependency and ordered out-of-home placement. Defendant's dependency counsel filed a timely notice of appeal on June 18, 2013.

11

## A. Legal Standard

The law with respect to a minor with cases in both the dependency system and the delinquency system is as follows:  "Under section 300, a child who is neglected or abused falls within the juvenile court's protective jurisdiction as a ' "dependent child of the court." ' [Citation.]  As a dependent, the juvenile court may remove the minor from the home, or place the minor in alternative care that meets his or her needs for custody, care and guidance.  [Citation.]  Alternatively, the juvenile court may take jurisdiction over a minor as a ' "ward of the court" when the child is habitually disobedient or truant' under section 601, or commits a crime under section 602.  [Citation.]  When a minor is adjudged a ward of the court, the minor is subject to more-restrictive placements because of his or her criminal conduct and the court may commit the minor to a juvenile home, ranch, camp, forestry camp, or juvenile hall.  [Citation.]  The Legislature has declared that a minor cannot simultaneously be both a dependent and a ward of the juvenile court.  [Citation]  [¶] Section 241.1 sets forth the procedure for handling cases with dual jurisdiction in which a minor is both a dependent under section 300 and a ward under sections 601 or 602.  It requires the probation department and the welfare department to jointly develop a written protocol to determine which status will best serve the interests of the minor and the protection of society.  Once completed, the report is presented to the juvenile court for a determination of the appropriate status for the minor.  [Citation.]  The joint assessment report must contain the joint recommendation of the probation department and child welfare departments and also include (1) a description of the nature of the referral, (2) the age of the child, (3) the history of any physical, sexual or emotional abuse of the child, (4) the prior record of the child's parents for abuse of this or any other child, (5) the prior record of the child for out-of-control or delinquent behavior, (6) the parents' cooperation with the child's school, (7) the child's functioning at school, (8) the nature of the child's home environment, (9) the history of involvement of any agencies or

professionals with the child and his or her family, (10) any services or community agencies that are available to assist the child and his or her family, (11) a statement by any counsel currently representing the child, and (12) a statement by any court-appointed special advocate (CASA) volunteer currently appointed for the child."[3] (*In re Joey G.* (2012) 206 Cal.App.4th 343, 347 (*Joey G.*).)

"We review the juvenile court's determination under section 241.1 for abuse of discretion. [Citation]. 'To show abuse of discretion, the appellant must demonstrate the juvenile court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a miscarriage of justice.' [Citation.] Throughout our analysis, we will not lightly substitute our decision for that rendered by the juvenile court. Rather, we must indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings where there is substantial evidence to support them." (*In re M.V.* (2014) 225 Cal.App.4th 1495, 1506–1507 (*M.V.*).)[4]

## B.     The Juvenile Court's Section 241.1 Determination

The juvenile court adopted the recommendation of both probation department and the Agency and determined defendant should be adjudged a juvenile court ward and his dependency proceedings dismissed. As noted above, when a minor is both a dependent under section 300 and a ward under section 602, the juvenile court is required by section 241.1 to "determine which status is appropriate for the minor." (§ 241.1, subd. (a).) When doing so, the juvenile court considers the recommendations of the county

---

[3] The list of items required in a section 241.1 report is derived from section 241.1 and California Rules of Court, rule 5.512(d).

[4] In arguing for sufficiency of the evidence review rather than abuse of discretion, defendant cites *In re Marcus G.* (1999) 73 Cal.App.4th 1008, 1014, in which the court found that there was insufficient evidence to support the order dismissing the minor's dependency petition because the joint assessment required by section 241.1 had not been performed or presented to the court. In this case, however, a section 241.1 report was prepared and considered by the court, so we find *Marcus G.* inapposite.

13

probation department and the child welfare services department as to "which status will serve the best interests of the minor and the protection of society." (*Ibid.*) Thus, as our colleagues in Division Four stated recently, "within the context of the juvenile court law generally," section 241.1 grants "broad discretion to the juvenile court when determining which status will best meet a particular minor's needs. (See § 202, subd. (b) [both delinquent and dependent minors shall receive 'care, treatment, and guidance' that is 'consistent with their best interest']; *Joey G., supra,* 206 Cal.App.4th at p. 346 [juvenile court determination under § 241.1 reviewable only for abuse of discretion]; see also *In re Abdirahman S.* (1997) 58 Cal.App.4th 963, 969 [68 Cal. Rptr. 2d 402] [juvenile delinquency court has broad discretion to set conditions of probation for purpose of rehabilitation]; *In re Jose M.* (1988) 206 Cal.App.3d 1098, 1103–1104, [254 Cal. Rptr. 364] [juvenile dependency court 'has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion'].)" (*M.V., supra,* 225 Cal.App.4th at p. 1513.)

Notwithstanding the juvenile courts "significant latitude in this area" (*M.V., supra,* 222 Cal.App.4th at p. 534), defendant contends the juvenile court erred in choosing wardship over dependency. Reviewing the factors specified under section 241.1, defendant concludes they "clearly show[] that the minor should have remained a dependent." Defendant downplays the seriousness of the crime and his role in it, asserting "nothing was taken from the home," he was merely the "lookout," and the crime was committed impulsively because his family overlooked his birthday, and emphasizes his relative youth (age 14), his long history of dependency, and his dysfunctional home environment.

We are not unsympathetic to the fact defendant experienced a traumatic early childhood, a chaotic home environment, and continues to wrestle with the resulting mental and behavioral problems in his teenage years; nevertheless, on this record defendant fails to demonstrate the juvenile court abused its discretion in selecting

14

wardship over dependency as the system that would best serve his interests at this juncture. The juvenile court judge was understandably concerned with defendant's escalating criminal conduct and out-of-control behavior, which posed great dangers to himself and others. (See § 202, subd. (a) [the purpose of the juvenile court law is "to provide for the protection and safety of . . . each minor under the jurisdiction of the juvenile court"].) As related in the section 241.1 report, defendant "has absconded from every Social Services placement . . . . He will not attend school. He smokes weed with his friends, hangs out past his 8:45 p.m. curfew, and often stays out overnight without his mother's permission with people his mother does not know. [Defendant] is also very defiant towards most of the adults in his life. . . . [¶] . . . [Defendant] stated to his child welfare worker . . . his plan is to . . . go AWOL, not to go to school, and get in trouble so no one will deal with him and he can be sent home." Even mother told the court defendant thinks "he grown [*sic*], he can go rob people, . . . go in people [*sic*] houses" and that he "don't want to go to school, don't want to follow the rules." The judge opined defendant's behavior had escalated to the point where wardship is appropriate and that defendant would benefit from a structured placement where "he can get the school . . . [and] the services he needs." In sum, we see no abuse of discretion in the juvenile court's conclusion that defendant's interests would best be served through the delinquency system.

Defendant also asserts the juvenile court's 241.1 determination was defective because the delinquency court judge failed to review his dependency file prior to determining his status as a ward. The People argue the delinquency court judge was not required to examine defendant's voluminous dependency file and, moreover, that defendant has forfeited this point by failing to raise it below. The People are correct on the first point because "neither section 241.1 nor [California Rules of Court,] rule 5.512 requires judicial examination of the full dependency file. In fact, while section 241.1 requires that relevant 'records of other agencies' be considered by Probation and the

Agency in the development of their recommendation regarding a dual status minor [citation], the 241.1 report prescribed by rule 5.512 requires only 'the history of involvement' of those agencies.  This makes sense as a well-drafted 241.1 report should successfully summarize the minor's social history, including the impact of any previous abuse or neglect on current wrongdoing, that would otherwise be contained in the underlying records.  [Citations.]  Of course, where the best interests of a child are at stake, it may well be prudent for the juvenile court to consider as much information as possible.  However, *review of the entire dependency file was not mandatory*."  (*M.V., supra,* 225 Cal.App.4th at pp. 1514–1515, italics added.)  Accordingly, even if the court did not review the entire dependency file prior to making its section 241.1 determination, reversal is not warranted on that basis.

## C.      *Timing of the Section 241.1 Assessment*

Defendant contends the juvenile court violated his constitutional and statutory rights to due process by holding the section 602 jurisdictional hearing before a section 241.1 assessment had been completed.  In this regard, defendant asserts section 241.1 requires the assessment to be filed early in the proceedings and notes that California Rules of Court, rule 5.512 (rule 5.512), addressing the joint assessment procedure under section 241.1, specifically requires the joint assessment be prepared before the jurisdictional hearing.  (See rule 5.512(e) ["If the child is detained, the hearing on the joint assessment report must occur as soon as possible after or concurrent with the detention hearing, but no later than 15 court days after the order of detention and *before the jurisdictional hearing*."], italics added.)

Here, defendant was ordered detained on the section 602 petition on April 25, 2013; on May 1, 2013, the juvenile court assumed jurisdiction on the 602 petition after defendant knowingly and voluntary pleaded guilty to second degree burglary with dismissal of the misdemeanor weapons charge; and, on May 22, 2013, the juvenile court held the section 241.1 hearing.  Clearly, the timing of the section 241.1 hearing in this

16

case did not comport with rule 5.512(e) because it occurred after the jurisdictional hearing.[5]

However, defendant failed to object in trial court to the section 602 hearing going forward before a section 241.1 assessment had been conducted pursuant to rule 5.512. Indeed, defendant affirmatively acquiesced in the section 602 proceeding: After full advisement and waiver of his constitutional rights, defendant entered into a plea bargain allowing him to admit to the reduced charge of second degree burglary with dismissal of the misdemeanor weapons charge. Accordingly, defendant has forfeited this issue on appeal for failure to object below. (See, e.g., *In re Dakota S.* (2000) 85 Cal.App.4th 494, 502 [citing cases in which appellate courts have applied the forfeiture doctrine "in dependency proceedings in a wide variety of contexts, including cases involving failures to obtain various reports required by statute"]; see also *M.V., supra,* 225 Cal.App.4th at p. 1508 ["Contrary to appellant's assertion, the fact that section 241.1 imposes a 'mandatory' statutory duty does not preclude the application of the forfeiture rule."].)

Even if the issue was not forfeited, the failure to comply with rule 5.512 is not of constitutional magnitude. "A procedural due process claim . . . requires a deprivation of a constitutionally protected interest and a denial of adequate procedural protections. [Citations.] Although what procedural process is due in a given circumstance may vary,

---

[5] Interestingly, in *M.V.,* Division Four noted "that at least one commentator has indicated that the timeframes set forth in rule 5.512(e) may be contrary to the best interests of the minor and the protection of society and therefore void as inconsistent with the intent of section 241.1. (See Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2013) § 3.27[2], p. 3-52 [citing *California Court Reporters Assn. v. Judicial Council of California* (1995) 39 Cal.App.4th 15, 24–26, 46 Cal.Rptr.2d 44].) This is because a decision to terminate one status should not be made until after a determination that the jurisdictional allegations supporting the alternate status are true. [Citation.] As is pertinent to the present matter, '[s]ince the full nature of the delinquency allegations may not become clear until after they have been litigated and the juvenile court may or may not find those allegations true,' there may be 'substantial merit' to deferring the section 241.1 determination until after the jurisdiction hearing in the appropriate case." (*M.V., supra,* 225 Cal.App.4th at p. 1507, fn. 4.)

17

it 'always requires a relatively level playing field, the "constitutional floor" of a "fair trial in a fair tribunal," in other words, a fair hearing before a neutral or unbiased decision-maker.' " (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 265–266.) In particular, "In the dependency context, due process may be implicated where a required investigative report is completely omitted. [Citation.] However, where 'the assessment report is prepared, is available to the parties in advance of the noticed hearing, and does *address* the principal questions at issue in the particular proceeding, errors or omissions in the report cannot be characterized in terms of denial of due process.' [Citation.] Here, a section 241.1 report was prepared and available prior to the court's noticed section 241.1 hearing and did address the principal question at issue. Further, the report was considered by the juvenile court—along with argument by the parties regarding the report's recommendation—before the court announced its section 241.1 decision. Under such circumstances, we do not perceive any lateness in the report's preparation to be a defect that fundamentally undermined the statutory scheme such that the minor was unable to avail herself of its protections." (*M.V, supra,* 225 Cal.App.4th at p. 1510.) The same holds true in this case.

In sum, defendant forfeited any issue concerning the tardiness of the section 241.1 assessment by failing to object below and, even if the issue is not forfeited, any tardiness in the preparation of the section 241.1 assessment did not violate defendant's constitutional and statutory rights to due process.

## D. *Maximum Confinement Time*

Defendant contends the juvenile court erred in determining that his maximum time of confinement under section 726, subdivision (d), is three years six months, instead of three years. The Attorney General agrees, as do we.

At the dispositional hearing on May 22, 2013, the court determined defendant's maximum time of confinement was three years six months. The maximum time of confinement for the offense to which defendant pleaded guilty—second degree

18

burglary—is three years.  (See Pen. Code, §§ 461, subd. (b), 1170, subd. (h).)  The trial court apparently added six months to the maximum time of confinement for second degree burglary based on defendant's first adjudication for misdemeanor battery in 2010 (see *ante,* fn. 2), as well as a section 602 petition filed in Contra Costa County in March 2012, alleging misdemeanor battery on a school employee.

However, defendant was not declared a ward of the court in the 2010 matter, so no custody time remains from that adjudication (see § 726, subd. (d)), and the record indicates the 2012 matter was dismissed in Contra Costa County and no finding was ever made on that petition.  More importantly, as the Attorney General correctly acknowledges, no aggregation of any prior adjudications was permissible because the prosecutor did not give the required notice.  (See *In re Donnell L.* (1989) 212 Cal.App.3d 185, 192 ["a petition under section 602 must contain notice of the intent to rely upon previously sustained petitions under section 602, in order to aggregate the maximum period of confinement on the basis of those petitions"].)  In sum, we agree that the maximum time of confinement is three years.

## DISPOSITION

The juvenile court is directed to amend the dispositional order to reflect a maximum time of confinement of three years.  As modified, the dispositional order is affirmed.

_____
Becton, J.*

We concur:

_____
Margulies, Acting P.J.

_____
Banke, J.

* Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.